## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **FURNELL MILLS,** | : | Case No. 1:13 CV 439 |
| Petitioner, | : | |
| vs. | : | |
| **DAVID BOBBY, WARDEN** | : | **MAGISTRATE'S REPORT AND** |
| | : | **RECOMMENDATION** |
| Respondent. | | |

### I. INTRODUCTION

Pursuant to 72.2(b)(2) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES, this case was automatically referred to the undersigned Magistrate Judge for report and recommendation.  Pending are the Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254 (Docket No. 1); Respondent's Return of Writ (Docket No. 4) and Petitioner's Traverse (Docket No. 13).  For the reasons that follow, the Magistrate recommends that the Court deny the Petition for Writ of Habeas Corpus.

### II. FACTUAL BACKGROUND.

{¶ 6}  The evidence at trial revealed that on December 31, 2009, at approximately 1:30 p.m., Brian Boyd was leaving his friend's house on Yale Avenue in Cleveland, Ohio, when two males robbed him at gunpoint.  According to Mr. Boyd, one of the males was carrying a small silver gun and the other one was

carrying a black, long, ".38 old police gun with a long nose." Mr. Boyd was ordered to lie on his stomach on the ground. The males then searched his pockets and took his money. And then, inexplicably, one of the males shot him in the back, and they both fled the scene.

{¶ 7} Mr. Boyd was taken to the hospital and remained under hospital care until March 25, 2010. While in the hospital, Cleveland Detective Michael Legg questioned Mr. Boyd regarding the shooting and robbery and he also presented Mr. Boyd with a photo array containing six photos. Mr. Boyd positively identified Petitioner from the photos as one of the perpetrators. He additionally identified Petitioner at trial as one of the two perpetrators.

{¶ 8} Detective Legg testified that he interviewed several people in connection with the robbery and shooting, including the owner of the residence where Mr. Boyd was visiting and the next door neighbor, Anthony Acton. According to Acton, Petitioner was at his house on the day of the incident, hanging out with Acton's little brother, Aaron Jackson. Acton explained that he knew Petitioner through Petitioner's cousin, Cameron Davis. Acton further testified that he heard the gunshots but did not see the shooting. After the shooting, Acton, who was driving with Davis, observed Mills walking down East Boulevard, going toward St. Clair Avenue. Acton testified that they stopped for Petitioner to get a ride and that once inside the vehicle, Petitioner told his cousin, Davis, that he "hit a lick," which meant that he committed a robbery, and that Petitioner further confessed to shooting the victim outside of Acton's house. Acton further testified that he did not see Petitioner with a gun in the car but that the previous week he saw Petitioner with a "short-barreled .38 revolver and a long-barreled .38 revolver."

{¶ 9} Detective Legg also testified that he obtained surveillance video from December 31, 2009 of Norman's Deli, a store near the scene of the crime, where the perpetrators were reported to have been seen on the day of the incident. Detective Legg identified Petitioner in the video as well as Acton's brother, Aaron Jackson.

{¶ 10} In his statement to the police, Petitioner admitted that he was at Aaron's house and Norman's Deli earlier in the day on December 31, 2009, but that he left with his friend Dajon Williams. He further stated that later in the day he and Dajon were at the corner of East 99th Street and East Boulevard when they spotted Acton and Davis at a stop sign. They proceeded to flag them down and asked them for a ride. According to Petitioner, Davis told him that he and Aaron "hit a lick on the dro," meaning that they robbed the victim for marijuana, and that he saw Davis hide the gun under a mattress. Petitioner also stated that, earlier in the day, Aaron had bought a .38 gun, which Petitioner admitted that he had touched at some point. According to Petitioner, Aaron purchased the gun 15 minutes before they all went to Norman's Deli, prior to the incident.

-2-

{¶ 11} The state offered testimony establishing that the police recovered three pieces of bullet fragments on the scene; they did not find any shell casings. Detective Legg explained that shell casings are extracted from a semiautomatic or automatic weapon when fired but that a revolver would only extract the bullet that exited the firearm.  The state further presented the testimony of Aldeandre Wilson, the victim's friend residing at Yale Avenue, who testified that Petitioner attempted to sell him an iPod the day before the incident and asked him if he had any bullets for a .38 revolver, which Wilson observed Petitioner carrying.

*State v. Mills,* 2011 WL 3366379, *1 -2 (2011).

### III. PROCEDURAL HISTORY.

Petitioner, a juvenile at the time the underlying offenses were committed, was bound over to Cuyahoga County Common Pleas Court to be tried as an adult on May 18, 2010 (Docket No. 4-3, p. 10 of 10).

### 1.   INDICTMENT AND PRETRIAL MOTION.

Petitioner was indicted on eight counts, which included the following:

| COUNTS | CHARGE | A VIOLATION OF: |
|---|---|---|
| 1 | Attempted murder. | OHIO REV. CODE §§ 2923.02, 2903.02(A). |
| 2 & 3 | Kidnaping | OHIO REV. CODE §§ 2905.01(A)(2), (A)(3). |
| 4 & 5 | Felonious assault | OHIO REV. CODE §§ 2903.11(A)(1), (A)(2). |
| 6 & 7 | Aggravated robbery | OHIO REV. CODE §§ 2911.01(A)(1), (A)(3). |
| 8 | Carrying a concealed weapon | OHIO REV. CODE § 2923.12(A)(2). |

The first seven counts carried one and three-year firearm specifications (Docket No. 4-2).

In a motion to suppress filed on August 13, 2010, Petitioner argued that the identification procedure was unduly suggestive and led to an "irreputable misidentification."  The court conducted a hearing on September 22, 2010, and denied the motion (Docket No. 4-4; 4-6 and 4-7).

### 2.   CONVICTION AND SENTENCE.

Trial commenced on September 27, 2010 and on October 1, 2010, the jury returned the

-3-

following verdict:

> Not guilty of attempted murder and kidnaping with a firearm specification as
> charged in Counts 1 and 3 of the indictment.
> Guilty of kidnaping with a firearm specification; felonious assault with firearm
> specification and aggravated robbery with a firearm specification as charged in
> Counts 2, 4, 5, 6 and 7 of the indictment (Docket No. 4-8).

On October 6, 2010, the court imposed a prison sentence of 16 years (base charge), three years

for the firearm specifications for a total of 19 years on October 6, 2010 and five years mandatory

post control release (Docket No. 4-9).

**3.      DIRECT APPEAL.**

Petitioner filed a notice of appeal in the Court of Appeals of Cuyahoga County, Ohio, on

October 12, 2010, and in his appellate brief filed on January 18, 2011, Petitioner asserted two

assignments of error:

> 1.      "The identification procedure was the result of illegally obtained evidence, was
>         unreliable, unduly prejudicial and violated appellant's rights under the Due
>         Process Clause and the Fourth and Fifth Amendments of the United States
>         Constitution."
>
> 2.      "The jury's verdicts are against the manifest weight of the evidence"
>
> (Docket No. 4-16, p. 4 of 30).

The court of appeals released and journalized an entry and opinion on August 4, 2011 in which it

overruled the assignments of error and affirmed the conviction (Docket No. 4-18).

**4.      APPEAL TO THE SUPREME COURT OF OHIO.**

Petitioner perfected a notice of appeal on September 19, 2011 in the Supreme Court of

Ohio, and subsequently presented the propositions of law:

> 1.      Pretrial identification procedures that utilize booking  photographs taken as part
>         of an illegal arrest are tainted and must be suppressed.
>
> 2.      OHIO REV. CODE § 2151.313(A)(1) does not permit the use of a booking

photograph taken during an illegal arrest without the permission of the child in the presence of his or her parents[1].

3.  The State bears the burden of proving by a preponderance of the evidence that a warrantless arrest was constitutionally valid and failure of the state to do so requires suppression of booking photographs as fruit of the illegal arrest.

4.  When police advise a witness that a suspect has been identified and then show the witness a photo lineup, police must take affirmative steps such as specifically advising the witness that the suspect may not be depicted before showing the witness a photo lineup or array (Docket No. 4-19, 4-20 & 4-21).

The Supreme Court of Ohio denied Petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question on November 30, 2011 (Docket No. 4-22).

**5.  MOTION FOR POST CONVICTION RELIEF.**

In the court of common pleas, Petitioner filed a motion for strict compliance [with] CRIM. R. 32[2] on April 24, 2012.  Petitioner requested that the court appoint counsel, convene an oral hearing and vacate his sentence for the reasons that:

1.  The judgment entry of sentence was invalid and therefore a nullity.

2.  The trial court did not have jurisdiction for want of properly and timely filing of the indictment.

(Docket No. 4-23).

On May 9, 2012, Judge Dick Ambrose denied the motion for reasons that the court's

---

[1]

(A)(1) Except as provided in division (A)(2) of this section and in sections 109.57, 109.60, and 109.61 of the Revised Code, no child shall be fingerprinted or photographed in the investigation of any violation of law without the consent of the juvenile judge.  OHIO REV. CODE § 2151.313(A)(1) (Thomson Reuters 2013).

[2]

A judgment of conviction shall set forth the fact of conviction and the sentence.  Multiple judgments of conviction may be addressed in one judgment entry.  If the defendant is found not guilty or for any other reason is entitled to be discharged, the court shall render judgment accordingly.  The judge shall sign the judgment and the clerk shall enter it on the journal.  A judgment is effective only when entered on the journal by the clerk.

journal entry complied with the requirements of CRIM. R. 32(C) and Petitioner's argument regarding the validity of the indictment should have been raised on appeal and was therefore barred by the doctrine of *res judicata* (Docket No. 4-25).

Petitioner filed a notice of appeal on May 30, 2012 and on July 13, 2012, the court of appeals, *sua sponte,* dismissed the appeal for failure to file the record (Docket No. 4-26; 4-27; 4-28).

> **6.** **PETITION FOR WRIT OF HABEAS CORPUS**.

Petitioner filed a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus in the United States District Court for Northern District of Ohio, Eastern Division, on February 28, 2013.  The sole basis for which he seeks relief is:

> The photographic identification procedure was unduly suggestive because the victim was told that the suspect had already been arrested, thus suggesting to the victim that the defendant's photograph was one of the six displayed in the array (Docket No. 1).

> **III. PROCEDURAL REQUIREMENTS**.

The threshold limitations to judicial review in a habeas case are whether a petitioner has legitimately presented his or her claims in a timely manner and whether his or her claim has been procedurally defaulted.

> **1.** **STATUTE OF LIMITATIONS**.

On April 24, 1996, Congress passed the ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT (AEDPA)*,* in which 28 U.S.C. § 2244 was amended to include a new one-year limitations period in which prisoners could file a petition for a writ of habeas corpus in the federal courts pursuant to 28 U.S.C. § 2254.  *Swingle v. Money*, 215 F.Supp.2d 919, 921

(N.D.Ohio,2002).  Under the AEDPA, a petitioner must file an application for a writ of habeas corpus within one year of the date upon which the judgment becomes final.  *Id.* (*See* 28 U.S.C. § 2244(d)(1)).  A judgment becomes final upon "the conclusion of direct review or the expiration of the time for seeking such review."  *Id*. (*citing* 28 U. S. C. § 2244(d)(1)(A)).

The one year period is tolled for that amount of time in which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending.  *Payton v. Brigano*, 256 F.3d 405, 409 (6th Cir.2001).  The limitation's period is tolled for the 90-day period in which a petitioner could seek *certiorari* in the United States Supreme Court.  *DeDonno v. Hurley,* 2008 WL 20482059, *5 (N.D.Ohio, 2008) (*See Lawrence v. Florida*, 127 S.Ct. 1079 (2007)).

Here, Petitioner pursued his direct appeal to the state court of last resort and the conviction became final on November 30, 2011.  The statute began running on February 28, 2012, the date when the time to seek review by *certiorari* in the United States Supreme Court expired.  The statute ran for 56 days until Petitioner requested review pursuant to CRIM. R. 32 in the common pleas court on April 24, 2012.  The appellate court, *sua sponte,* dismissed the appeal on July 13, 2012 and Petitioner abandoned further review by the Supreme Court of Ohio.  The statute began running again on July 14, 2012 and expired on May 9, 2013.  Petitioner filed his Petition for Writ of Habeas Corpus on February 18, 2013.

Petitioner met the statute of limitations time requirements.  His Petition is not time barred.

2.    EXHAUSTION

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  *Starks v. Sheldon,* 2013 WL 3992592, *31 (N.D.Ohio,2013) (*citing* 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 109 S.Ct. 1056, 1059 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir.1991)).  A petitioner must fairly present any claims to the state courts in a constitutional context properly to exhaust state remedies.  *Id.* (*citing Anderson v. Harless*, 103 S.Ct. 276 (1982); *Picard v. Connor*, 92 S.Ct. 509 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir.1989)).  "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."  *Id.* (*citing Picard, supra*, 92 S.Ct. at 512; *see also Harris v. Reeves*, 794 F.2d 1168, 1174 (6th Cir.1986)).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims.  *Id.* (*citing Manning v. Alexander*, 912 F.2d 878, 881–883 (6th Cir.1990)).

Here, Petitioner ensured that he complied with the required federal exhaustion review, sufficiently raising his claim in a constitutional context of due process and fundamental fairness on direct appeal and in the Supreme Court of Ohio.  The exhaustion of state-court remedies is sufficient to allow the Magistrate to reach the merits of Petitioner's claim consistent with the habeas standard of review.

## IV. HABEAS REVIEW STANDARD.

A timely filed application for a writ of habeas corpus on behalf of a person in custody shall not be granted with respect to any claim adjudicated on the merits in state court proceedings unless the adjudication of the claim—

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (Thomson Reuters 2013).

A decision is "contrary to" clearly established federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Holder v. Palmer*, 588 F. 3d 328, 343 (6th Cir. 2009) (*citing Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000)). A state court decision will be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. *Id.* (*citing Williams*, 120 S.Ct. at 1523) (emphasis added).

A decision is an unreasonable application of clearly established federal law if it identifies the correct principle of law but unreasonably applies it. *Williams v. Coyle,* 260 F.3d 684, 699 (6th Cir. 2001) *cert. denied,* 122 S.Ct. 2635 (2002) (*See Williams v. Taylor, supra*, 120 S. Ct. at 1519). An unreasonable application of federal law is different from an incorrect application of federal law. *Id.* Under Section 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law

-9-

erroneously or incorrectly.  *Id.*  Rather, that application must also be unreasonable.  *Id.* (*citing Williams v. Taylor, supra*, 120 S.Ct. at 1521) (original emphasis)).

As a condition for obtaining habeas relief from the federal court, a state prisoner must show that the state court's decision was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  *Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011).  This bar is difficult to meet because "'habeas corpus is a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Id.* (*citing Jackson v. Virginia*, 99 S.Ct. 2781, 2795, n.5 (1979)).

## V. ANALYSIS.

Petitioner argues in the Petition and Traverse that the identification by the eyewitness was tainted by unduly suggestive pretrial behavior of the police, leading to an irreputable misidentification.  Specifically, when police advised Mr. Boyer that a suspect had already been arrested, it impermissibly suggested that the prime target in the investigation was in the photographic array presented to him.  Plaintiff argues that he was denied due process of law and that a conviction based on this unnecessarily suggestive and mistaken identification should be voided.

Respondent contends that the totality of the circumstances demonstrate that the eyewitness identification was not impermissibly suggestive and unreliable.  For that reason, the state court adjudication permitting the admissibility of the eyewitness identification was not an unreasonable application of Supreme Court precedent established in *Neil v. Biggers*, 93 S.Ct. 375 (1972).

In *Neil,* several principles emerged with respect to relationship between impermissible

-10-

suggestiveness and misidentification. *Id.* at 381. First, the likelihood of misidentification violates a defendant's right to due process. *Id.* at 381-382. Second, suggestive confrontations are disapproved because they increase the likelihood of misidentification. Third, unnecessarily suggestive identifications are condemned for the further reason that the increased chance of misidentification is gratuitous. *Id.* at 382. Fourth, where the indicators of the eyewitness' ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed. Fifth, among the factors to be considered in evaluating a witness' ability to make an accurate identification, the trier of fact should consider:

1. The opportunity of the witness to view the criminal at the time of the crime.
2. The witness' degree of attention.
3. The accuracy of his or her prior description of the criminal.
4. The level of certainty demonstrated at the confrontation.
5. The time between the crime and the confrontation.

*Id.* at 199–200.

A conviction based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Cornwell v. Bradshaw,* 559 F.3d 398, 413 (6th Cir. 2009) *cert. denied,* 130 S.Ct. 1141 (2010) (*citing Simmons v. United States*, 88 S.Ct. 967, 971 (1968)). "[E]ach case must be considered on its own facts . . . " *Id.* (*citing Simmons,* 88 S. Ct. at 971). In determining whether an identification is admissible, this court follows a two-part analysis. *Id.* The court first considers whether the procedure was unduly suggestive. *Id.* (*citing Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir.2001); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir.1994) *cert. denied*, 115 S.Ct. 2584(1995)). The court must decide if the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection. *Id.* (*citing Wilson,* 250 F.3d

-11-

at 397).  "The defendant bears the burden of proving this element." *Id.* (*citing Ledbetter*, 35 F.3d at 1071) (citation omitted).  If the procedure was suggestive, the court then determines whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible. *Id.* (*citing Wilson*, 250 F.3d at 397) (citation omitted); *Ledbetter*, 35 F.3d at 1071).

Here, the trial court satisfied the elements of certainty required in *Neil* by evaluating Mr. Boyd's ability to make an accurate identification when assessing the merits of the motion to suppress.  The court considered that the procedure in compiling the array appeared to follow the departmental procedures in terms of using a computer program to find pictures of individuals with similar characteristics and to randomly place the photos in a photo array.  Detective Legg testified that he generated a photographic lineup that was compiled from the police photo laboratory (Docket No. 4-7, pp. 88-89 of 125).  Petitioner does not challenge the size of the array, the details of the photographs pulled for the array or the content of the array.

Petitioner contends that the police were unduly suggestive in leading Mr. Boyd to assume that the suspect was in the photographic lineup.  The unrefuted testimony of Detective Legg was that he did not tell Mr. Boyd that the suspect was in the photographic array.  Petitioner was never singled out; rather, Detective Legg presented the photographic array to Mr. Boyd at the hospital; laid the photographic array down on the chair beside Mr. Boyd; and asked Mr. Boyd whether he recognized anyone.  Detective Legg gave Mr. Boyd the photographs and walked to the other side of the hospital room (Docket No. 4-7, p. 90 of 125).  This evidence does not render the identification and Mr. Boyd's selection in the photographic array *per se* unreliable or unduly suggestive.

It was undisputed that Mr. Boyd had an opportunity to view his attackers at the time of the crime.  Mr. Boyd testified that prior to the two men pulling their masks down, he saw their

-12-

faces for 45 seconds to a minute.  When one of the robbers came close to him, Mr. Boyd had an opportunity to see his face, particularly his forehead and "stuff" in the ten seconds before he put his mask on.  During cross-examination, Mr. Boyd explained that he made eye-to-eye contact with one of the robbers (Docket No. 4-7, pp. 24; 25; 28; 30; 57-58 of 125).

Even with the passage of time, Mr. Boyd recalled his heightened state of awareness at the time of the crime.  He was certain that he saw Petitioner lurking around the outside of his friend's house, if only for a brief time, before he was robbed and shot.  When the presence of the two unmasked gunmen was acknowledged, Mr. Boyd realized that he was going to be robbed and/or shot (Docket No. 4-7, pp. 22-24 of 125).

The trial court considered the level of certainty demonstrated by Mr. Boyd in communicating that Petitioner was the perpetrator.  During the two months that Mr. Boyd was hospitalized, Detective Legg conducted an investigation based on other witness identifications and footage from a camera located at a local deli.  Once Mr. Boyd was able to communicate, Detective Legg and two officers came to the hospital and brought pictures of six putative suspects (Docket No. 4-7, pp. 35; 36 of 125).  Detective Legg told Mr. Boyd that they had a suspect and he asked Mr. Boyd to identify his attacker if he saw him in the photograph array.  Mr. Boyd was certain that the perpetrator was suspect number 5 and he circled, signed and dated the picture (Docket No. 4-7, pp. 91 of 125).  Photo number 5 was actually a booking photograph that was believed to have been taken of Petitioner on or about January 5, 2010,when he was arrested by Cleveland Police Department on suspicion of committing the crimes on December 31, 2009 (Docket No. 4-7, p. 114 of 125).

The trial court considered that Mr. Boyd was not familiar with Petitioner and that Mr. Boyd had not been unduly influenced by his family or others prior to publishing his

-13-

identification (Docket No. 4-7, pp. 122-123 of 125).

The trial court concluded that Petitioner failed to establish undue suggestions in the identification procedure itself or that Mr. Boyd was steered to Petitioner, which he had the burden to prove. There was no testimony of any inherently prejudicial or suggestive comments, prompting or improper gestures made by Detective Legg or any other officers before the identification was made. The identification of Petitioner in the photographic array was based purely upon Mr. Boyd's observation and recollection. Because Petitioner failed to show that the procedure employed to identify Petitioner was unduly suggestive, the trial court was not required to determine whether under the totality of the circumstances, the identification was reliable and therefore admissible.

The Magistrate is persuaded that the rejection of Petitioner's claim on direct appeal and by the Supreme Court of Ohio was neither contrary to, nor an unreasonable application of clearly established Supreme Court precedent. Neither was the rejection based on an unreasonable determination of the facts in light of the evidence presented.

## IX. CONCLUSION

For these reasons, the Magistrate recommends the Court deny the Petition for Writ of Habeas Corpus and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: January 29, 2014

## X. NOTICE.

Please take notice that as of this date the Magistrate Judge's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to this report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

-15-